POLANCO, DEMANDANTE-APELANTE-APELADO, *v.* SOCIÉTÉ ANONYME DES SUCRERIES DE SAINT JEAN, DEMANDADA-APELADA-APELANTE.

No. 2766.—*Visto:* Noviembre 20, 1923. *Resuelto:* Mayo 31, 1924.

SIEMBRA Y MOLIENDA DE CAÑAS—INTERPRETACIÓN DE CONTRATO.—En este caso el colono demandante celebró un contrato de siembra y molienda de cañas con la central demandada por el cual se obligó a sembrar y cultivar 250 cuerdas durante las zafras de 1913, 14, 15, 16 y 17 para ser molidas por la demandada, la cual se obligó a pagar al colono el 6 por ciento de la caña molida o el precio más alto que durante el contrato pagara a cualquier otro colono. Interpretando esta última cláusula, *se resolvió:* que habiéndose probado que la central pagó mayores precios a otros colonos, el demandante tiene derecho a tal aumento, hubiera o no paridad entre su contrato y los de los colonos beneficiados, no debiendo estimarse tampoco que el demandante dejó de cumplir el contrato por el hecho de que en algún caso no hubiera cosechado a razón de quince toneladas por cuerda, pues bastaba con probar que cultivó 250 cuerdas de terreno de un año para otro.

SENTENCIA de *Pablo Berga,* J. (Humacao), en acción sobre cobro de cantidad, declarando sin lugar la demanda y la contrademanda, sin costas. *Revocada en cuanto se declaró sin lugar la demanda y confirmada en lo demás.*

*H. G. Molina,* abogado de la demandada-apelada-apelante; *Sarmiento & Puig,* abogados del demandante-apelante-apelado.

EL JUEZ ASOCIADO SEÑOR WOLF, emitió la opinión del tribunal.

El día 11 de abril, 1912, José Nicolás Polanco celebró un contrato de molienda de cañas con la corporación demandada de 250 cuerdas de cañas para las zafras de 1913, 1914, 1915, 1916 y 1917, y entregar el producto para molerse a

la referida demandada.    Esta última convino recíprocamente en entregar a Polanco el 6 por ciento de la caña molida. La controversia gira sobre una cláusula especial de beneficio contenida en el contrato y que dice así: "La Central Santa Juana se compromete a beneficiar al Sr. Nicolás Polanco durante la vigencia de este contrato, con el beneficio concedido sobre el pago de las cañas a cualquier otro colono." La significación indubitada de esta frase, algo parecida a la cláusula de la "nación más favorecida" era que Polanco recibiría por la caña entregada a la Central un precio tan alto como el recibido por cualquier otro colono. Hubo prueba no refutada tendente a acreditar que en los años 1913 y 1914 uno de los colonos de la Central recibió el 6½ por ciento de la azúcar y que en los años 1916 y 1917, uno o tal vez dos colonos recibieron el 7 por ciento.    En el interrogatorio de repreguntas un colono que recibió el 7 por ciento manifestó que la mitad del 1 por ciento era para transportación a distancia, pero otro colono recibía el 7 por ciento directamente sin limitación.    Alguna otra alegación hizo Polanco pero la conclusión de la corte y la prueba misma está en contra de tal reclamación.    Hubo prueba creditiva del valor de la caña entregada por Polanco.    La corte, sin embargo, resolvió que Polanco no tenía derecho al precio extra porque había dejado de cumplir con el contrato principal y también la corte indicó que no estaba satisfecha de que los pagos a otros colonos no se hacían bajo condiciones diferentes a las del contrato de Polanco.    La corte dictó sentencia contra Polanco y también dictó sentencia contra la demandada declarando su contrademanda sin lugar.    Cada una de las partes ha apelado.

Como cuestión *prima facie* hubo prueba que no fué refutada respecto al pago de precios mayores a otros colonos. Los testigos no han sido atacados.    No existe ninguna prueba en oposición.    La corte meramente inquirió si existía una absoluta paridad en cuanto al contrato del demandante con la Central y la misma central con los demás colonos.    Asi-

mismo estamos exactamente en igual situación que estuvo la corte inferior al apreciar la prueba. La prueba fué oída por un juez que cesó en su puesto antes de que fuera archivado el récord en maquinilla y por virtud de una estipulación el caso fué sometido al nuevo juez sobre las alegaciones, documentos y prueba archivada escrita en maquinilla. No tenemos duda de que el demandante probó un caso *prima facie* de pagos mayores a otros colonos durante la vigencia del contrato.

La defensa principal es que el demandante dejó de cumplir su parte del contrato y por tanto no puede exigir el cumplimiento de la cláusula especial de beneficio. La corte dice que Polanco tenía la obligación de "entregar" 250 cuerdas de cañas cada año por virtud del contrato celebrado en abril 11, 1912, y que él no lo hizo así y que la intención de las partes fué que la cláusula especial de beneficio era solamente aplicable en caso de cumplimiento.

No hemos podido entender exactamente lo que se quiere decir con la "entrega" de 250 cuerdas de cañas. El contrato requiere a Polanco sembrar, plantar y cultivar 250 cuerdas de terreno. Algo así como si fuera una condición implícita en el contrato se hace referencia por la corte y la central apelada a la necesidad de cosechar 15 toneladas por cuerda, pero no existe tal condición o mención en el contrato. Lo que la corte dijo fué que la prueba tendía a demostrar que una cuerda en la región en cuestión debidamente cultivada debía producir 15 toneladas de caña. No hubo prueba satisfactoria alguna de tal condición general si semejante cosa podía surgir en una finca, o entre estas partes, y el contrato nada dice sobre la cantidad de caña que ha de producirse. Todo lo que el demandante tendría que probar es que él cultivó de un año a otro substancialmente 250 cuerdas de terreno y esto la prueba tiende a demostrar a nuestra satisfacción.

La prueba de Polanco respecto al año 1915 fué aceptada y confirmada por la central. Las partes estuvieron confor-

mes en que el cultivo fuese abandonado prácticamente ese año.

La central a la vez conviene en que Polanco cultivó 250 cuerdas en el año 1913. La contención principal es que a Polanco le faltaron unas 100 cuerdas en 1914. Polanco declaró que él cultivó 250 cuerdas en ese año. El fué llamado como testigo dos veces. En su primera declaración estuvo interesado principalmente en probar las liquidaciones que había hecho con la compañía, los precios y cantidad de caña entregada. Cuando el demandante con otro testigo ofreció prueba para corroborarse en cuanto a la cantidad de caña entregada, la demandada alegó que no era la debida refutación y además por la razón de que la demandada había aceptado la declaración de Polanco acerca del número de cuerdas entregadas. Después declaró Polanco que había cultivado 250 cuerdas en el año 1914 y con semillas de plantilla. Ahora bien, aunque esta declaración subsiguiente no está sostenida como lo estuvo la anterior, no tenemos ninguna razón para dudar de ella y estamos satisfechos de que toda la prueba demuestra un cumplimiento substancial con el contrato.

Polanco tenía también la obligación bajo un contrato de cultivar otras 100 cuerdas y los autos y la prueba admitida de Polanco explica la disposición de estas 100 cuerdas. Algún tiempo después de la zafra de 1914 la central escribió a Polanco quejándose de que de una plantación de 345 cuerdas hubo un rendimiento por término medio de solamente cinco toneladas por cuerda. Este número de 345 cuerdas es aproximadamente 250 y 100 y parece ser una admisión de que Polanco tenía bajo cultivo las 250 cuerdas necesarias. Parte de la controversia giró sobre el hecho de que en el año 1914 Polanco no abandonó el terreno que producía menos de 18 toneladas por cuerda. De su contrato, sin embargo, resulta claro que tal abandono sólo era obligatorio después del segundo corte. La central no duda que en los años 1916 y 1917 Polanco tenía las 250 cuerdas necesarias bajo

cultivo. Fué el rendimiento del año 1914, según creemos, lo que hizo que la central impugnara la siembra de ese año. Convenimos con la corte en que Polanco no tenía derecho a los 25 centavos extras pagados en 1917 o 1918.

Existen algunas consideraciones que son esencialmente importantes que a nuestro modo de ver resuelven el caso en su totalidad. Cada año o más a menudo la central hacía liquidaciones con Polanco y le pagaba el precio estipulado en el contrato. En ningún momento dudó ella sobre sus siembras excepto en la carta de 1914 a la cual hemos hecho referencia, y que fué escrita a virtud de una apreciación errónea de los términos del primitivo contrato. La compañía recibió la caña, la aceptó prácticamente sin reparo y estaba obligada a pagar el precio. El precio no era solamente el 6 por ciento convenido en el contrato original sino el que debía pagarse a cualquier otro colono. No vemos ninguna diferencia entre esto y la aceptación por un comerciante de una cantidad menor de artículos de los que han sido pedidos, aún suponiendo que Polanco en realidad cultivó menos de la cantidad de caña que había convenido.

Sin embargo, hemos revisado la prueba también porque la contrademanda en parte se funda en la falta de Polanco en cumplir su contrato. Algunas de las precedentes consideraciones indicativas del cumplimiento resuelven esta parte de la contrademanda. La corte no encontró ninguna prueba de daños y perjuicios para sostener la contrademanda pero basamos nuestra decisión en el cumplimiento por parte de Polanco. Si quedase alguna duda las liquidaciones ponen término a toda esta clase de contrademanda.

Volviendo nuevamente a la questión relativa a los beneficios, el hecho de que Polanco de año en año no hiciera ninguna reclamación extra del precio apenas sería una renuncia, pues no hay prueba satisfactoria de que él tuviera conocimiento de los arreglos hechos con otros colonos sino después de la liquidación, con excepción de la de 1917 y la de ese año él se negó a firmarla. La demanda alegaba

que Polanco no tuvo noticia de estos beneficios hasta un mes o dos antes de iniciarse el pleito, pero la prueba demostró que tenía conocimiento de esto en octubre de 1916. La liquidación de ese año se hizo en julio. El demandante pidió permiso para enmendar en este particular, y si bien no consta que su petición fuera resuelta, la incongruencia no fué fatal. Dudamos también, sin resolver definitivamente, si un conocimiento anterior hubiera sido una renuncia.

Como parte de su contrademanda o reconvención la demandada también alegó la entrega y uso por Polanco de ciertos bueyes pertenecientes a ella así como la alegación de que los bueyes estuvieron mal cuidados y que algunos se murieron. Estamos conformes con la corte inferior en que el uso de estos bueyes no era objeto de ningún contrato y fué un acto meramente gratuito por parte de la demandada para ayudarse y también a Polanco en la preparación de la cosecha. Este acto gratuito era semejante a algunas de las concesiones que se hacían a otros colonos para ayudarles a transportar sus cañas y cuyas concesiones con tal fin la corte inferior se negó a considerar como un beneficio dentro de la letra y espíritu de la citada cláusula especial de beneficio.

Los beneficios de los años 1913, 1914, 1916 y 1917 resumidos en el alegato del apelante importan la suma de $9,196.48 y estas cantidades están de acuerdo con la declaración de Polanco, la que parece no haber sido refutada en relación con esto.

Al revocar esta sentencia, siguiendo la regla general no imponemos costas a la demandada, especialmente porque su defensa no careció de algún mérito y la demandada destruyó algunas de las alegaciones hechas por el demandante y éste se vió obligado a enmendar varios extremos en el juicio y pretendió hacer otras enmiendas.

*Debe revocarse la sentencia apelada y dictarse otra a favor de Polanco* por la suma de $9,196.48 con intereses sobre dicha cantidad al 6 por ciento a partir del día 21 de

septiembre de 1917, fecha de la presentación de la demanda, y *confirmarse en sus demás pronunciamientos.*

RESOLUCIÓN SOBRE RECONSIDERACIÓN DE AGOSTO 1, 1924

EL JUEZ ASOCIADO SEÑOR WOLF, emitió la opinión del tribunal.

El abogado manifiesta ahora. que en su alegato original no trató de contestar a lós cálculos hechos por Polanco porque él. consideraba los cálculos o la reclamación frívolos. El abogado asume entonces que este tribunal aceptó los cálculos del abogado de Polanco sin· hacer un examen de los autos. Este es un claro error. Comprobamos cuidadosa-mente las manifestaciones hechas por Polanco, en los autos, en las cuales demostró sucesivamente que las cuatro partidas de su reclamación eran $556.20, $459.71, $5,999.54 y $2,181.03. En verdad que en un sitio redujo su reclamación de $2,174.19 a $459.71, y obtuvo permiso para enmendar su demanda en este sentido. Estos cálculos están hechos todos en la declaración de Polanco después de ofrecer como prueba la alegada carta circular de la central. Nuestra opinión expresa que las cifras hechas por el apelante estaban de acuerdo con su declaración. Sin embargo, la corte hubiera estado justificada en aceptar las conclusiones o cálculos que hizo Polanco en su alegato, a falta de impugnación.

La apelada tenía al parecer tanta confianza en su contrademanda o en el incumplimiento por parte de Polanco, según fuere, que no trató originalmente de atacar la· base o bases en las cuales descansaba la reclamación. Insiste la apelada en su moción en que el tipo convenido en el contrato en pagarse a Polanco, era de 6¼ en vez de 6.. Parece que en cuanto a esto los autos no fueron examinados con cuidado. Al final del contrato de abril 11, 1912, hay una nota que explica que de los 6¼ que menciona el contrato, 6 era el pago de la caña y ¼ para gastos. La contestación de la demandada admite esto específicamente y es así:

"Que en los dos contratos relacionados, la demandada se obligó a satisfacer al demandante, en pago de cada quintal de caña que recibiera, seis libras de azúcar, y además, en concepto de ayuda para el transporte de las cañas, un cuarto de libra de azúcar, también por cada quintal de caña."

Al considerar los beneficios obtenidos por otros colonos, nosotros y al parecer la corte inferior excluimos las libras o por cientos pagados a otros colonos, lo cual era una concesión por gastos o distancias extraordinarios y no al precio mismo de la caña. Esto también lo demuestra nuestra opinión. Estábamos algo dudosos de si tanto Cabezudo como Manrique obtuvieron el 7 por ciento por la caña entregada lo mismo en 1916 que en 1917, pero ahora creemos que ambos lo obtuvieron. No vemos que establezca ninguna diferencia el hecho de que Manrique recibiera el ½ por ciento toda vez que no tomó prestado ningún dinero en efectivo. Cuando los colonos toman dinero a préstamo generalmente pagan un *quid pro quo* de interés. Sin embargo, sólo era necesario para Polanco probar que uno de ellos recibió el 7 por ciento. La base de comparación es el precio pagado por la caña, excluyendo la concesión extra hecha, bien a Polanco o a los otros colonos.

No es necesario, por tanto, tratar de analizar en detalle los varios cálculos hechos por la apelada. Por ejemplo, la apelada trata ahora de demostrar que calculando los beneficios del año 1913, al tipo de ¼ Polanco sólo hubiera tenido derecho a $263.58. Al ½, que es el correcto beneficio, Polanco entonces hubiera tenido derecho a $527.16, en vez de $556.20, que reclamaba. La apelada funda su cálculo en ciertos alegados promedios de precio para el año 1913. Polanco aparentemente no tomaba promedios sino que calculaba sobre cada entrega. Como este cálculo no se impugnaba en el alegato y ni fué claramente atacado con este fin en el juicio, creemos que es demasiado tarde para tratar de corregir cualquier posible error de cálculo hecho por el testigo, por medio de una moción de reconsideración.

No podemos entender por qué una reclamación como ésta deba considerarse frívola a menos que la apelada quisiera dar a entender que estaba enteramente satisfecha del incumplimiento por parte de Polanco. La central pagó evidentemente a otros más de lo que pagó a Polanco. Dicha demandada se encargó de resolver si Polanco tenía o nó derecho a un beneficio por otros motivos que no fueran los expresados en el contrato. En ningún momento dió la central a Polanco una oportunidad para hacer una reclamación por dichos beneficios. Como ya hemos indicado, la central parecía creer que los anticipos eran suficiente excusa para no pagar beneficios. Pero entonces, como sostuvo el apelante, la cláusula de beneficios carecería de significado.

Una de las razones para la reconsideración es el haber resuelto esta corte que Polanco sólo estaba obligado a cultivar 250 cuerdas de caña y según lo interpretamos, eso es lo que dice el contrato. A riesgo de repetir lo que dijimos, podemos decir que si bien la central puede haber creído o deseado que Polanco debía cultivar 15 ó 18 toneladas por cuerda, el contrato no dice eso. No encontramos nada en la declaración del testigo de la demandada, Wittemans, que muestre un entendimiento o convenio en cosechar 15 ó 18 toneladas por cuerda.

En cuanto al cumplimiento, estamos satisfechos en primer lugar en que la carta de la central que hacía referencia a las 345 cuerdas no era meramente una circular. Trataba exactamente de la condición del cultivo de Polanco y le urgía que hiciera mayores esfuerzos. Estamos enteramente de acuerdo en que la apelada tal vez nunca autorizó así a Polanco a abandonar alguna parte del cultivo, pero estamos satisfechos de que la central consintió implícitamente cualquier falta al hacer sus varias liquidaciones, al escribir la carta y cuando ejercitó la superintendencia general que aparece de los autos.

Dijimos que estábamos dispuestos a dar crédito a las declaraciones de Polanco respecto al cumplimiento, especial-

mente porque sus manifestaciones acerca de las cantidades entregadas fueron aceptadas. La apelada desea que confrontemos sus manifestaciones con las de su gestor Wittemans. En general nos pareció que Polanco conocía sus propios asuntos mejor que ningún otro. No estando puesta en tela de juicio su honradez, es mucho más probable que tenga él razón que no Wittemans. Los autos en conjunto nos convencen de que o hubo un completo cumplimiento, o una renuncia por la central y que la contrademanda hubiera sido inconcebible como acción independiente si Polanco no hubiera insistido en sus derechos en cuanto a beneficios del contrato.

*Denegada.*